

FILED

Nov 14 2019, 5:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Karen Celestino-Horseman
Of Counsel, Austin & Jones, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Stephen R. Lewis
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Raul Hernandez-Velazquez, *Appellant-Respondent,* and Modesto Hernandez and Elizabeth Barcaleta, *Appellants-Intervenors,* v. Sondra Hernandez, *Appellee-Petitioner* | November 14, 2019 Court of Appeals Case No. 18A-DR-3109 Appeal from the Fountain Circuit Court The Honorable Samuel A. Swaim, Special Judge Trial Court Cause No. 23C01-1411-DR-332 |

**Vaidik, Chief Judge.**

# Case Summary

Raul Hernandez-Velazquez ("Husband"), Modesto Hernandez, and Elizabeth Barcaleta Santiago (collectively, "Appellants") appeal the trial court's order requiring the conveyances of certain properties to Sondra Hernandez ("Wife") to effectuate the division of marital assets in Husband and Wife's divorce. Specifically, Appellants argue that the trial court erred in finding that Wife is a creditor under the Uniform Fraudulent Transfer Act (UFTA), by finding that Husband conveyed several properties to Elizabeth shortly before the divorce with the intent to defraud Wife, and by setting aside those conveyances. Because the evidence supports the trial court's finding that Wife is a creditor under UFTA and that Husband's intent was fraudulent, we affirm.

# Facts and Procedural History

Husband and Wife were married in August 2001. Wife is a United States citizen. Husband is a citizen of Mexico and resides in the United States without proper documentation. Husband worked from approximately 2001 to 2005 at Lithonia Lighting and then at Harrison Steel from 2005 to 2008. For her part, Wife worked as a translator on a contract basis for the Southeast Fountain School Corporation and Fountain Circuit Court. She also babysat occasionally but was primarily focused on raising her and Husband's four children: S.H., born in May 2002, A.H., born in January 2006, and twins, I.H. and M.H., born in April 2008. To afford their daily living expenses, the family

applied for and received government benefits, such as housing assistance, food stamps, and Medicaid.

[3] Husband's brother, Modesto, was close to the family throughout the marriage. Modesto is also a citizen of Mexico and resides in the United States without proper documentation. Although they have never been married, Modesto has been in a relationship with Elizabeth, also a citizen of Mexico, for more than thirty years, and together they have three children. Since Modesto arrived in the United States in 1999, without Elizabeth, he has worked for Masterguard, Perdue, Harrison Steel, and Closure Systems International. He also mows lawns whenever he can. In September 2005, Husband and Modesto decided to buy and renovate a foreclosed house at 317 Harrison Street in Crawfordsville. The brothers bought the house for $11,000 cash, with Modesto putting $9,600 toward the purchase price and Husband providing the rest and doing the renovations. *See* Tr. Vol. III p. 99. The house was titled and insured in Husband's name. After renovations were complete, 317 Harrison Street was rented for $600 a month. Tr. Vol. II p. 24; *see also* Ex. 12. Wife was responsible for collecting rent and paying property taxes. In June 2006, Husband and Modesto decided to buy and renovate another house, this one located at 316 W. Van Buren Street in Veedersburg. The brothers bought the house for $18,000 cash. *See* Ex. 36. The house was titled and insured in Husband's name. This house was Husband and Wife's marital home through the remainder of the marriage.

[4] After Husband was fired from Harrison Steel in 2008, he and Wife started a business—Sorani Construction and Remodeling—that would buy foreclosed homes, fix them up, and then rent or sell them. Tr. Vol. II p. 15. In January 2010, Husband decided to buy and renovate a foreclosed duplex at 115 N. Walnut Street in Crawfordsville. The duplex was purchased for $10,500 cash and was titled and insured in Husband's name. After renovations were complete, each unit at 115 N. Walnut Street was rented for $400 a month. Ex. 27. Wife was responsible for collecting rent, and Sorani Construction paid the property taxes. In March 2010, Husband decided to buy and renovate a foreclosed house at 821 N. Sherman Street in Veedersburg. The purchase price of the house was $9,000 and was paid for by a cashier's check in Husband's name. The house was titled and insured in Husband's name. After renovations were complete, 821 N. Sherman Street was rented for $425 a month. *See* Ex. 48. Wife was responsible for collecting rent, and Husband paid the property taxes. In May, Husband and Modesto decided to buy a house located at 415 W. North Street in Crawfordsville. The brothers bought the house for $6,000 cash, with Modesto putting $5,348.24 toward the purchase price and Husband providing the rest and doing the renovations. The house was titled in Modesto's name, and Sorani Construction paid the property taxes.

[5] Two years later, in November 2012, Modesto married Wife's aunt, Penny Stonebraker. The marriage was part of Modesto's attempt to acquire lawful permanent resident status. Tr. Vol. II p. 140.

[6] In May 2013, Husband decided to buy and renovate a foreclosed house at 404 S. Grace Street in Crawfordsville. The purchase price of the house was $8,500 and was paid for by a cashier's check in Husband's name. Tr. Vol. II p. 43; *see also* Ex. 31. The house was titled and insured in Husband's name. After renovations were complete, 404 S. Grace Street was rented for $650 a month. Wife was responsible for collecting rent, and Sorani Construction paid the property taxes. In December, the brothers became worried that if Modesto divorced Penny, she could get the house located at 415 W. North Street, so Modesto transferred ownership of 415 W. North Street to Husband. Tr. Vol. II p. 32. Husband did not pay Modesto any money in exchange for the transfer. In February 2014, Husband sold 415 W. North Street to Jesus Trevino and Maria Magdalena under a rent-to-own arrangement. Ex. 17. The monthly payments are $680 a month. Tr. Vol. II p. 35.

[7] In April, Husband decided to buy and renovate a house at 515 Chambers Street in Veedersburg. He purchased the house for $19,500 cash, and it was titled and insured in his name. In September, while Modesto was still married to Penny, his partner, Elizabeth, arrived in the United States. Elizabeth arrived without proper documentation. Husband and Wife traveled to Texas to pick up Elizabeth, and after they returned to Indiana, their marriage began to deteriorate. Husband told Wife that she needed to show Elizabeth how to collect rent and issue receipts because Elizabeth would now do that job instead of Wife. Tr. Vol. III pp. 13-14. Husband also had Wife type a document saying that they owed Modesto $51,500. *Id.* at 133. Both Husband and Wife

signed the document. Then on October 13, Husband conveyed all the properties titled in his name to Elizabeth for ten dollars. Tr. Vol. II p. 17; *see also* Exs. 1, 2. Less than a month later, Wife requested a protective order, alleging that Husband had committed two acts of domestic violence against her—first on October 24 and then again on November 12. Wife then filed a petition for dissolution of marriage on November 18, 2014.

[8] In May 2016, the trial court entered its findings of fact and conclusions of law and decree of dissolution. *See* Appellant's App. Vol. II p. 12. Both parties filed motions to correct errors, and the trial court entered an agreed order vacating the property-division portion of the trial court's May 2016 order. A special judge was appointed to resolve the property-division issue.

[9] In July 2017, Wife filed an amended petition for dissolution of marriage, alleging that Husband "made the conveyances [to Elizabeth] with the intent to hinder, delay, and defraud creditors, including Wife, to protect and preserve the real property for Husband's own use and benefit, and to prevent and hinder Wife from collecting and receiving, . . . the amount due Wife in this dissolution of marriage action." Appellant's App. Vol. II p. 84. Wife did not cite UFTA in her amended petition, but she used language found in the statute, which provides, in relevant part:

> A transfer made or an obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> (B) intended to incur or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as the debts became due.

Ind. Code § 32-18-2-14. UFTA defines a "debtor" as "a person that is liable on a claim," Ind. Code § 32-18-2-2, and a "creditor" as "a person that has a claim," *id.*

[10] Wife's amended petition also brought Elizabeth into the proceedings. *See* Appellant's App. Vol. II pp. 83-86. In March 2018, Elizabeth and Modesto were permitted to intervene in the dissolution proceedings. *See id.* at 90.

[11] The trial court held the final hearing over three days on June 7, August 27, and October 18, 2018. Wife testified that she started Sorani Construction with Husband to "buy foreclosed homes, fix them up, rent them out or sell them." Tr. Vol. II p. 15. Wife said that she and Husband used savings to purchase the houses they bought and credit cards to pay for the remodeling. *Id.* at 73. Wife acknowledged that Modesto had loaned the family some money but alleged

that the money was "not directly for any certain property." *Id.* at 74, 170. Wife said that when they first started flipping homes, the family lived in an apartment and their rent was paid for by the government. *Id.* at 119. Wife also said that they received up to $500 a month in food stamps. *Id.* at 122. Wife testified that Husband told her that he transferred all their properties to Elizabeth in October 2014 to make sure that she "didn't get any properties when [she] filed for divorce." *Id.* at 18. Modesto testified that after Husband lost his job in 2008, he began loaning the family money for "bills and everything." *Id.* at 244. Modesto said that he would give Husband money as he needed and that over time he had loaned Husband about $39,000. *See id.* at 247. Husband testified that he had "a good job until 2008" and that after he was fired Modesto began helping his family financially. Tr. Vol. III p. 77. Husband said that when he was fired, he received around $22,000 in profit sharing but that all the money went to pay for things his children needed. *See id.* at 91. Husband acknowledged that he transferred all his properties to Elizabeth in October 2014 but said that he did so because he believed that all the properties belonged to Modesto. *Id.* at 104. Husband said that he believed that all the properties titled in his name belonged to Modesto because he had helped finance all the purchases. *See id.* at 149. Husband said that he "still" has an arrangement with Modesto that he is "going to do the labor and [Modesto] will repay [him]." *Id.* at 102. Husband also acknowledged that he withdrew $1,400 from his and Wife's bank account on November 12, 2014—the day before Wife obtained a protective order against him. *See id.* at 135. Elizabeth

testified that she does not speak English and that in order to collect rent for the properties, she must use an interpreter. *Id.* at 59, 63.

[12] In December 2018, the trial court issued its findings of fact and conclusions of law. The trial court found that UFTA applies to Husband's conveyance of the properties to Elizabeth and that Wife is a creditor under UFTA. Thereafter, the court addressed the disputed properties as follows:

> 33. [Husband] and Modesto allegedly formed a partnership in 2005 to purchase, flip, and rent homes in Montgomery and Fountain counties.

> *****

> 43. There is no documentary evidence to support the testimony regarding the partnership.

> *****

> 57. [Husband] purchased each property in a cash transaction. Cash transactions require far less time and effort from the buyer's perspective at closing. Given the lack of financing, the parties offered no explanation why the properties could not have been placed in Modesto's name, or that of the partnership, in his absence.

> 58. The documentary evidence overwhelmingly supports the inclusion of each of the properties in the marital estate.

> *****

64. Given the modest purchase prices, [Wife's] testimony that each of the properties was bought with the rental income is credible.

\*\*\*\*\*

67. Based on the applications for assistance, it appears that a significant portion of [Husband and Wife's] daily living expenses w[ere] paid using government benefits. The Court does not condone this behavior, but it offers some explanation regarding the disposable income necessary to purchase the distressed properties.

\*\*\*\*\*

74. [T]he Court finds that the conveyances on October 13, 2014 are fraudulent and are hereby set aside.

\*\*\*\*\*

76. The Court does find that Modesto Hernandez helped finance the purchase of most if not all the properties here under consideration. There ha[ve] been so many different attempts at defrauding the government and/or other parties it is impossible at this point to determine what the original intentions of the parties were as to these investments.

Appellant's App. Vol. II pp. 32-35. After putting the disputed properties into the marital pot, the trial court divided it 50-50. Wife was assigned the properties located at 317 Harrison Street, 415 W. North Street, 115 N. Walnut Street, and 316 W. Van Buren Street. *Id.* at 37. The trial court also ordered that "the parties shall execute quitclaim deeds within thirty (30) days of this

Order to convey title of each of the properties awarded to [Wife]." *Id.* at 36. Husband was assigned the properties located at 404 S. Grace Street, 821 N. Sherman Street, and 515 Chambers Street. *Id.* at 37. The trial court also found that Husband and Wife were both responsible for $51,500 they owed to Modesto. The trial court included the $51,500 as marital debt and divided it equally between Husband and Wife. *See id.* After the trial court divided the marital pot, it ordered Husband to pay Wife a lump-sum equalization payment of $2,382.30 within ninety days. *See id.*

[13] Husband, Modesto, and Elizabeth now appeal.

# Discussion and Decision

[14] Where, as here, the trial court enters special findings and conclusions pursuant to Indiana Trial Rule 52(A), we apply a two-tiered standard of review. *Barton v. Barton*, 47 N.E.3d 368, 373 (Ind. Ct. App. 2015), *trans. denied*. We determine first if the evidence supports the findings and second whether the findings support the judgment. *Id.* The trial court's findings and conclusions will be set aside only if clearly erroneous. *Id.* We neither reweigh the evidence nor reassess witness credibility. *Id.* Instead, we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them. *Id.*

[15] Appellants' brief touches on many different topics, but the gist of their argument appears to be that the trial court erred when it included the properties that Husband transferred to Elizabeth (in the marital pot). Appellants allege

that these properties were actually owned by Modesto and that therefore they cannot be included in the marital pot. It is well settled that in a dissolution action, all marital property, whether owned by either spouse before the marriage, acquired by either spouse after the marriage and before final separation of the parties, or acquired by their joint efforts, goes into the marital pot for division. Ind. Code § 31-15-7-4(a); *Falatovics v. Falatovics*, 15 N.E.3d 108, 110 (Ind. Ct. App. 2014). The date of "final separation" is the date the petition for dissolution is filed. Ind. Code § 31-9-2-46. When dividing marital property, the trial court must, at a minimum, be sufficiently apprised of the approximate gross value of the marital estate. *Montgomery v. Faust*, 910 N.E.2d 234, 238 (Ind. Ct. App. 2009). "The requirement that all marital assets be placed in the marital pot is meant to insure that the trial court first determines that value before endeavoring to divide property." *Id.* "Indiana's 'one pot' theory prohibits the exclusion of any asset in which a party has a vested interest from the scope of the trial court's power to divide and award." *Falatovics*, 15 N.E.3d at 110 (quotation omitted). While the trial court may decide to award a particular asset solely to one spouse as part of its just and reasonable property division, it must first include the asset in its consideration of the marital estate to be divided. *Id.*

[16] Here, the trial court found that there was evidence that Husband's conveyances to Elizabeth in October 2014 were fraudulent under UFTA. On appeal, Appellants argue that the trial court erred by setting aside these conveyances

pursuant to UFTA for two reasons: (1) Wife is not a creditor and (2) there is no evidence of an intent to defraud.

# I. Spouse as Creditor

Appellants argue that Wife is not a creditor under UFTA because the "properties were purchased by [Modesto] and [Modesto] had the legal right to direct to whom the properties should be conveyed, in this instance to [Elizabeth]." Appellant's Br. p. 17.

UFTA defines "creditor" as "a person that has a claim." I.C. § 32-18-2-2. The trial court found that "[a] spouse is a creditor" and that therefore Wife is a creditor under UFTA. Appellant's App. Vol. II p. 28. Appellants argue that Modesto financed the purchases of the properties and that therefore Wife is not a creditor under UFTA. *See* Appellant's Br. p. 17. However, there is ample evidence showing that Husband and Wife contributed to the purchases of the properties. First, Husband testified that he had a "good job until 2008." Tr. Vol. III p. 77. Next, Wife testified that she and Husband used their savings to purchase the properties and credit cards to do the renovations. *See* Tr. Vol. II p. 73. Wife also testified that during the time she and Husband were purchasing and flipping the properties, the family lived in an apartment paid for by the government and used food stamps to support their daily needs. *See id.* at 119, 122. Finally, the majority of the properties were initially titled and insured in either Husband or Wife's name, and the property taxes were paid by Husband and Wife's business, Sorani Construction. All of this supports the trial court's

finding that the properties are part of the marital estate for purposes of Husband and Wife's divorce, and therefore Wife is a creditor under UFTA because she has a claim to the properties. *See* Appellant's App. Vol. II p. 34.

## II. Fraudulent Intent

Appellants next argue that there is no evidence that indicates or suggests that the transfer of the properties from Husband to Elizabeth was made with the intent to hinder, delay, or defraud Wife in any way as required by UFTA.

A creditor who seeks to have a transfer set aside as fraudulent under UFTA bears the burden of proving that such transfer was made with fraudulent intent. *Greenfield v. Arden Seven Penn Partners, L.P.*, 757 N.E.2d 699, 703 (Ind. Ct. App. 2001), *trans. denied*. The question of fraudulent intent is a question of fact. *Id.* Lack of consideration alone is not enough to support a charge of fraud. *Id.* Rather, fraudulent intent may be inferred from various factors or "badges of fraud" present in a given transaction. *Id.* These common-law factors include:

1. the transfer of property by a debtor during the pendency of a suit;

2. a transfer of property that renders the debtor insolvent or greatly reduces his estate;

3. a series of contemporaneous transactions which strip a debtor of all property available for execution;

4. secret or hurried transactions not in the usual mode of doing business;

5. any transaction conducted in a manner differing from customary methods;

6. a transaction whereby the debtor retains benefits over the transferred property;

7. little or no consideration in return for the transfer;

8. a transfer of property between family members.

*Id.* (citing *Otte v. Otte*, 655 N.E.2d 76, 81 (Ind. Ct. App. 1995), *trans. denied*). As no single indicium constitutes a showing of fraudulent intent per se, the facts must be taken together to determine how many badges of fraud exist and if together they amount to a pattern of fraudulent intent. *Id.* Indiana's UFTA has codified these "badges of fraud." Under UFTA, to determine the debtor's intent, the trial court may consider, among other factors, whether:

(1) the debtor retained possession or control of the property transferred after the transfer;

(2) the transfer or obligation was disclosed or concealed;

(3) before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

(4) the transfer was of substantially all the debtor's assets;

(5) the debtor absconded;

(6) the debtor removed or concealed assets;

(7) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(8) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and

(9) the transfer occurred shortly before or shortly after a substantial debt was incurred.

I.C. § 32-18-2-14.

[21] Here, there are at least five "badges of fraud" present. First, the record shows that Husband transferred the properties to Elizabeth approximately one month before Wife filed for divorce and when the parties' relationship had already begun to deteriorate. Second, the transfer of these properties greatly reduced the marital estate because the rental properties were substantially all of the family's assets. Third, there is evidence that Husband would retain some benefits over the rental properties. That is, Husband, Modesto, and Elizabeth, would continue to renovate and manage the properties and collect rent from tenants. Fourth, Husband transferred the properties to Elizabeth for little or no consideration. That is, he transferred all the properties to Elizabeth for ten dollars. Finally, the transfer of these properties from Husband to Elizabeth was effectively a transfer between family members. Although Modesto and Elizabeth have never been married, they have been in a relationship for over thirty years and have three children together. All of this together constitutes a pattern of fraudulent intent.

[22] For all of the foregoing reasons, we affirm the trial court's setting aside of Husband's conveyances to Elizabeth.

[23] Affirmed.

Riley, J., and Bradford, J., concur.